388

HOLMES et al. v. FREDERICK W.
BERENS, Inc.

No. 8824.

United States Court of Appeals
District of Columbia.

Argued March 22, 1945.

Decided May 14, 1945.

Mr. Guilford Jameson, of Washington, D. C., for appellants.

Mr. Dale D. Drain, of Washington, D. C., for appellee.

Before GRONER, Chief Justice, and EDGERTON and ARNOLD, Associate Justices.

EDGERTON, Associate Justice.

Appellants sued appellee for commissions on certain sales of mortgage notes. The claim rests ultimately on this letter which appellee sent appellants on June 23, 1939: "Following our conversation we herewith confirm our proposal and agree to pay you a commission of 1% on all mortgage loans, either F. H. A. or conventional, made or handled by this office with any company, providing the establishing of a connection between the purchaser of the loans and this office has been or is to be established through your direct contact. In other words, you are to arrange an appointment with one or more prospective purchasers of mortgage loans and if the eventual negotiations are successful we agree to pay the commission as outlined above on all loans purchased by the companies as indicated."

The District Court found among other things that appellants introduced appellee's president to a man in the loan department of the Guardian Life Insurance Company; that negotiations between appellee and Guardian followed, but were abandoned about August 1, 1939 because of changes in interest rates; that these negotiations never resulted in any transactions; that a year and a half later, in 1941, appellee made some sales to Guardian; but that "the connection between the defendant [appellee] and the Guardian Life Insurance Company which resulted in the purchase from the defendant by said Guardian Life Insurance Company of mortgages was not established by the contact or negotiations above referred to, nor by any activities of plaintiffs [appellants], but resulted from independent negotiations initiated late in 1940 by the President of the Guardian Life Insurance Company. There had been changes in the general mortgage and money market which led the officers of the Guardian Life Insurance Company to consider the purchase of Federal Housing Administration loans, among other places, in the Washington area, and to seek a loan correspondent in Washington. The President of the Guardian Life Insurance Company sought and made contact with the defendant company, as well as with other mortgage houses selected by him from those approved as mortgagees by the Federal Housing Administration. He determined whom he wished to contact in this connection from information obtained by him from sources unrelated to plaintiffs, and consequently called on and negotiated with defendant's President on or about November 29, 1940." The court also found as a fact that the letter of June 23, 1939 contemplated that "the negotiations mentioned in said letter were those to follow * * * consequent to the contact or appointment to be arranged by plaintiffs." The court accordingly gave judgment to the defendant [appellee].

We think the record supports the findings. We need not recite the evidence. It does not vitiate the District Court's interpretation of the letter of June 23. The mere fact that this interpretation is not clearly wrong is reason enough for sustaining it. Moreover, we think it right. We think the parties did not intend that appellee should pay for any coincidence which might occur, but for any sale which might result from an introduction which appellants supplied. Though the phrase "the establishing of a connection" might conceivably refer to a first connection, whether fruitful or not, we think it is more naturally interpreted as referring to a fruitful connection. However that may be, the final sentence of the letter conveys the idea rather clearly: "* * * you are to arrange an appointment with one or more prospective purchasers of mortgage loans and if the eventual negotiations are successful we agree to pay the commission * * *." We take "the eventual" negotiations to mean the negotiations which eventuate, or in plain language result,[1] from an appointment which appellants arrange. Since appellee undertook to pay a commission only in case these negotiations were successful, the success of quite other negotiations imposed no liability on appellee.

Affirmed.

ARNOLD, Associate Justice (dissenting).

I cannot accept the majority's interpretation of the contract in this case. The written instrument reads as follows:

"June 23, 1939.
"Messrs. J. Duncan Holmes and G. B. Lloyd,
"Box 246, Manhasset,
"Long Island, New York
"Gentlemen:

"Following our conversation we herewith confirm our proposal and agree to pay you a commission of 1% on all mortgage loans, either F. H. A. or conventional, made or handled by this office with any company, providing the establishing of a connection between the purchaser of the loans and this office has been or is to be established through your direct contact. In other words, you are to arrange an appointment with one or more prospective purchasers of mortgage loans and if the eventual negotiations are successful we agree to pay the commission as outlined above on all loans purchased by the companies as indicated.

"Very truly yours,
"FWB-g        F. W. Berens   (Signed)"

Pursuant to the above agreement Holmes and Lloyd (appellants) introduced Berens, Inc., (appellee) to the Guardian Life Insurance Company. There was a long delay before negotiations with the Guardian Life were begun. However, eventually the loans were sold to that company. Holmes and Lloyd had done everything required by the written contract to entitle them to a commission under its terms.

The majority supports its conclusion that no commission is due by rewriting the contract, reading into it a provision that Holmes and Lloyd were required not only to establish a connection between the purchaser of the loan and Berens, Inc., but also to be some sort of a procuring cause of the loan.

This interpretation contradicts the plain language of the contract. The written instrument entitled Holmes and Lloyd to a commission if they arranged an appointment with a prospective purchaser and "if the eventual negotiations are successful". The word "eventual" is not a term used to express causation;[2] it is ordinarily a synonym for "final". It becomes necessary, therefore, for the majority to get rid of that word in order to reach its conclusion. This is ingeniously accomplished in the following sentence: "We take 'the' eventual negotiations to mean the negotiations which eventuate, or in plain language result, from an appointment which appellants

---

[1] "Eventual * * *. Belonging to, or determined by, the outcome or issue * * *." Webster's New International Dictionary (Second Edition, Unabridged) 1943.

"Eventual * * *. Of the nature of an event or result * * *. Ultimately resulting." Oxford Dictionary.

"Eventual * * *. Pertaining to the event or issue * * *." Century Dictionary.

[2] "Eventual. 1 Obs. a Pertaining to, consisting in, or of the nature of, an event. b Happening to exist. c Conditional. 2. Belonging to, or determined by, the outcome or issue; final; ultimate. Eventual success.' 3. Dependent on events; contingent." Webster's New International Dictionary (Second Edition, Unabridged) 1943.

One of the meanings of "eventual" given in the Oxford Dictionary is "ulti-

arrange". Thus the word "eventuate", which is sometimes, though rarely, used to express causation,[3] is adroitly substituted for the word "eventual." It is possible to say that a man's death eventuated from heart disease, though this is queer and stilted language. It would not be possible to say that the phrase "eventual death" referred to a death which eventuated from any particular cause. But by allowing the word "eventuate" to take the trick, the word "eventual" disappears into the discard. This seems to me more ingenious than persuasive.

The majority's interpretation is also contrary to the meaning which Berens, Inc., itself put upon the contract during its negotiations with the Guardian Life Insurance Company. At the time the sales were made Berens, Inc., was aware of the fact that Holmes and Lloyd had introduced the Guardian Life Insurance Company to it. Therefore, in order to escape paying a commission Berens wrote the following letter cancelling its contract with Holmes and Lloyd:

"December 10, 1940

"Messrs. J. Duncan Holmes and G. B. Lloyd

"Box 246, Manhasset

"Long Island, New York

"Gentlemen:

"Our auditor has come across a copy of a letter dated June 23, 1939 in which we agree to pay you a commission of 1% providing you establish a connection with one or more purchasers, and as no further action has been taken and as this is a part of the minutes a cancellation is in order.

"We have taken the liberty of cancelling this on our records and would appreciate a confirmation.

"Very truly yours,

"FWB: cjs           F. W. Berens"

Obviously, cancellation of the contract by Berens, Inc., could not deprive Holmes and Lloyd of commissions on loans which were in the process of negotiations at the time of such cancellation. It is, therefore, highly significant that the above letter of cancellation is so framed as to mislead Holmes and Lloyd into believing that no negotiation of any sort was pending at the time the letter was written. This concealment of the pending negotiations with the Guardian Life Insurance Company had no conceivable purpose unless Berens, Inc., believed at the time that Holmes and Lloyd would have been entitled to a commission had the truth been disclosed. It is regrettable that the decision of the majority permits Berens, Inc., to adopt one interpretation of the contract on the basis of which it misrepresented the facts and then later to adopt another in order to avoid liability after the facts became known. It would seem that ordinary principles of estoppel should prevent that result.

---

mately resulting". But obviously the phrase "ultimately resulting" in this connection does not mean "caused by". For example, when we say that the ultimate result of every war is eventual peace we do not mean that peace is caused by war.

[3] "Eventuate. To come out finally or in conclusion; to come to pass; to be the outcome; to result. *v. t.* To bring to an issue or conclusion." Ibid.